### HALE and others vs. MILWAUKEE DOCK COMPANY.

WAREHOUSE RECEIPT: *Maker estopped by its description of the property
only so far as visible or within his knowledge — Not negotiable, except as
a transfer of the property.*

1.  A warehouse receipt is a written simple contract, which binds the
    receiptor merely to safely store the goods, and to deliver *the same
    goods* to the bailor or his assignee of the receipt, except in those cases
    where there is some express agreement or known usage of trade
    which shows that the parties otherwise intended.

2.  The warehouseman is estopped from denying the description of the
    property in the receipt, so far as it relates to matters which are or
    ought to be within his knowledge, but not in respect to matters
    which are not visible or open to his inspection.

3.  A warehouse receipt is negotiable only to the same extent and for the
    same purposes as a bill of lading or a carrier's receipt. The indorse-
    ment or delivery of it does not convey the contract itself, but only
    the property represented by it, and it becomes a mere evidence of
    . the title of the holder in such property.

4.  Warehouse receipt in the following form:   " Received in store from M.
    for account of bearer, fifty-four barrels mess pork, deliverable on re-
    turn of this receipt and payment of storage." *Held*, that in the ab-
    sence of fraud or willful or negligent misrepresentation by the ware-
    houseman in respect to the description of the property, his obligation
    to any subsequent holder of the receipt, for value, was discharged by
    delivering or tendering the same property actually received in store
    and described as mess pork—although the barrels in fact did not con-
    tain mess pork, but salt.

Hale and others vs. Milwaukee Dock Company.

5. Ch. 340, Laws of 1860, as amended by sec. 1, ch. 78, Laws of 1863, (2 Tay. Stats., pp. 1846, 1847, secs. 42, 45, 46), does not render warehouse receipts *negotiable* in the sense in which bills of exchange are negotiable by the law merchant, nor estop the warehouseman from denying, as against an innocent transferee for value, that the property (therein described according to its external appearance and the representations of the original bailor) was really such as represented.

6. The object of the statute was simply to give validity to any pledge or transfer of the property, or any lien created thereon, by any person holding the warehouse receipt, and thus invested with *apparent* authority to make an *absolute* disposal thereof, although, as between him and a third party who is the real owner, he may have only a special property in the goods or a special authority in regard to disposing of them.

APPEAL from the Circuit Court for *Milwaukee* County.

Action upon four warehouse receipts, executed by the defendant, in form as follows: "Received in store from McLaren on account of bearer 54 bbls. mess pork, deliverable on return of this receipt and payment of storage," which the plaintiffs allege that they received, in the usual course of business, as security for moneys advanced by them on the faith thereof to a third party, who obtained them for a valuable consideration. They allege that defendant refused to deliver the property on their demand, and seek to recover its value.

The defendants admit that they executed the receipts, and allege that they did so upon receiving in store the number of barrels receipted for from one Edward White, a pork packer, filled and closed up as barrels of pork usually are, and branded "mess pork," and represented to contain mess pork, though in fact containing salt only; and that they believed such representations to be true. They further allege that they have carefully kept and stored the same, and, upon the plaintiffs' demanding barrels of mess pork on such receipts, they offered to deliver to them the very same barrels so received, and for which the receipts were given, but the plaintiffs refused to receive them.

The facts were proved as alleged by the parties. A former appeal in this case is reported in 23 Wis., p. 276.

The jury returned a verdict for the plaintiffs, and the defendant appeals from the judgment rendered thereon.

*E. Mariner*, for appellants, contended that warehouse receipts are not negotiable paper, under the law merchant. Chap. 34, Laws of 1860, does not undertake to fix the liability of a warehouseman on his receipt. *Rice v. Cutler*, 17 Wis., 351. The plaintiffs stand in the shoes of their assignors, and the contract is open to equities. Edwards on Bailments, 287; *Willard v. Bridge*, 4 Barb., 361; *Suydam v. Smith*, 7 Hill., 182; *Thompson v. Dominy*, 14 M. & W., 403; *Blanchard v. Pays*, 8 Gray, 281; *Bank of Rochester v. Colt*, 15 Barb., 506. The defendant's delivering the property bailed, as offered, would have been a performance of the contract contained in the receipts. It is of the very essence of the contract, as well as its exact language, that the very property "received in store," shall be returned. The contract is one of bailment. Any delivery which does not provide for a return of the very same property is a sale or exchange. *Norton v. Woodruff*, 2 N. Y., 153.

The transfer of the receipts does not create any new rights. It has no other operation or effect than as a symbolical delivery of the property.

The defendants are not estopped to deny that the barrels contained pork. *Gardner v. Horn*, 25 N. Y., 595. They had no right to inspect it. They could not compel the plaintiffs to receive mess pork upon these receipts, and the estoppel would not be mutual. Representations made in good faith, but induced by fraud, do not estop. *Mackey v. Holland*, 4 Metc., 69; *Whitaker v. Williams*, 20 Conn., 98, 527; *Taylor v. Ely*, 25 id., 250.

*Finches, Lynde & Miller*, for respondents, argued that these warehouse receipts, running to bearer, are purely commercial paper, and intended to pass from hand to hand; that they are made negotiable by chapter 340, Laws of 1860, and chapter 73, Laws of 1863, and are not subject to equities. *Crosby v. Roub*, 16 Wis., 616; 1 Smith L. C., 259, 742; 1 Parsons on Bills, etc.,

274, 279; 20 How. (U. S.), 364; 1 Wallace, 95, 203. As between the maker and the assignee of such receipts, both being innocent, the former ought to suffer the loss. He is estopped from denying the representations of the receipts. 2 Term, 70; 34 N. Y., 30; 15 Wis., 75; Story on Part., § 108; 2 Smith L. C., 702-3; *Proudfoot v. Montefiore*, L. R. 2 Q. B., 511; 16 N. Y., 142; 29 Eng., L. & E., 323; *Pickard v. Sears*, 6 Ad. & Ellis, 115; 3 Pick., 38; 25 Conn., 118; 13 N. Y., 316; 3 Hill, 219; 1 Salk., 289; 9 Cl. & Fin., 277; 25 N. Y., 595; 6 Mass., 425; 1 B. & Ad., 712; 12 Barb., 99; 5 Seld., 534; 7 Bosw., 372; 11 Law. Reg., 680; 2 Blatch., 118; 1 Greenl. Ev., 207; 24 Pick., 196. 4 Metc., 381; 1 Wis., 382, 452; 2 id., 322; 3 id., 657; Edwards on Bailm., 63. The cases holding that a receipt for property "in good condition," relates only to apparent condition, were between original parties. 2 Blatch., 116; 1 Black, 156; 3 Allen, 105; 8 Gray, 287; 7 Ad. & Ellis, 29.

On the motion for a rehearing, they further argued, that by the acts of 1861 and 1863, the legislature evidently intended to make warehouse receipts, on which the words "not negotiable" were not plainly stamped or written, valid in the hands of a *bona fide* purchaser, by making it a penal offense willfully to issue a receipt for property not *actually received;* by providing that receipts marked "not negotiable" should be exempt from the provisions of these acts; by giving to every person aggrieved his action for damages for any violation thereof, whether willful or not; and by making them transferable by delivery so as to entitle the transferee to be deemed the owner of the goods, etc., *therein specified.*

The following opinion was delivered at the June term, 1871:

DIXON, C. J. This cause was most ably and exhaustively argued at the bar on both sides, as well on the first appeal as on this, and I thought at that time and so I still continue to think, that the tender or offer by the defendant to deliver to the plaintiffs the same parcels and barrels received by the defendant in

store, and for which the receipt was given, was, and is, a discharge of the obligation of the defendant, and full satisfaction and performance of the contract on its part. I think this conclusion clearly follows from the nature and terms of the contract itself, and from the nature and extent of its negotiable qualities as known and defined by law. And such I understood, and still understand, was the unanimous opinion of this court when the cause was here before, as expressed by Mr. Justice COLE on that occasion. He says : " Now it seems to us that the defendant, being a warehouseman, may well be estopped as against one who takes the warehouse receipt for a valuable consideration, from denying the truth of the statements to which it gives credit by its signature, so far as those statements relate to matters which are or ought to be within its knowledge or the knowledge its agents ; but that, in respect to things not open to inspection and visible, like the contents of pork barrels, it ought not to be concluded by the description of the property in the receipt. This is the rule applied in the case of receipts or bills of lading given by common carriers, as to the interior condition of the property shipped, and we cannot see why it is not also applicable to the case at bar." 23 Wis., 280. This appears to me to be entirely conclusive of the question, and to show that the defendant cannot be held responsible for the contents of the barrels, or that they actually contained mess pork, even in favor of a *bona fide* assignee, or holder for value of the receipt. I have, however, gone carefully over the ground again, and examined the authorities, and am more than ever convinced of the correctness of the views thus taken and expressed by this court at that time.

The receipt of a warehouseman or wharfinger, and the receipt or bill of lading of a common carrier, are contracts of precisely the same general nature and effect, and should obviously be governed by the same rules and principles as to the application of the doctrine of estoppel or negotiability, which, with respect to such contracts, mean one and the same thing. They

are or may be said to be negotiable or conclusive, in the hands of a *bona fide* assignee or holder for value, so far as the party executing them, warehouseman or carrier, has made, or is bound by, the representations contained in them. They are negotiable or conclusive and valid in the hands of such a holder, because the signer, or party by whom they are executed, is estopped, or not permitted to deny the existence of the facts represented in or by them, and which are presumed to have been within his knowledge at the time of their execution. Negotiability, or *quasi* negotiability as it has sometimes been more properly called, and estoppel, when spoken of with respect to such instruments, mean, therefore, one and the same thing. In *Rowly v. Bigelow*, 12 Pick., 307, 314, and *Stanton v. Eager*, 16 id., 467, 474, carriers' receipts or bills of lading are spoken of as *quasi* negotiable, which is the more accurate form of expression. A bill of lading or carrier's receipt for goods to be transported, and the receipt of a warehouseman or wharfinger for goods in store or to be forwarded, are both contracts of bailment.

Both the carrier and the warehouseman are bailees for hire, the former agreeing to carry and deliver the identical goods or property received at the place designated or agreed upon, and the latter to forward, or redeliver or return the very same goods or property on presentation of the receipt, unless there be some express agreement, or known usage, or custom of trade or business, showing that the parties otherwise intended. It is of the very essence of both agreements that the very same property received shall be carried, delivered or returned to the party who may be entitled thereto, in discharge of the obligation of the bailees. The delivery or return of the same property, and of no other, will discharge such obligation or duty and satisfy the terms of the contract. Even in case of fraud, or willful untruth, or misrepresentation on the part of the bailee, or, in a case like the present, where he is himself deceived or misled, without fault on his part, by the fraudulent concealment or devices of the bailor, no other or corresponding property or

goods can be tendered in performance of the contract. In the former case, the bailee (and in the latter also, if liable) must respond in damages for the value of the property represented by the receipt, unless the party entitled to the same elects to receive other property instead.

"It seems to be thus well established," says Chief Justice SHAW, in his most elaborate opinion in *Blanchard v. Page*, 8 Gray, 281, 295, "that a bill of lading is a written simple contract between a shipper of goods and a ship-owner, the latter to carry the goods and the former to pay the stipulated compensation for that service." And the same is true of a warehouseman's receipt. It is a written simple contract between the owner of the goods and the warehouseman, the latter to store the goods and the former to pay the compensation for that service. Such is the contract here. The language is : "Received in store from McLaren for account of bearer fifty-four bbls. mess pork, deliverable on return of this receipt and payment of storage." The meaning of this clearly is, that the same fifty-four barrels received in store, and described as mess pork, are deliverable or to be delivered to the bearer of the receipt on return of the same and payment of storage ; and the warehouseman, not less than the ship-owner or carrier, is bound to deliver the identical goods received in fulfillment of his contract. Nothing short of this discharges the obligation or amounts to a performance, and, in the absence of fraud, or misrepresentation, or negligence on his part in giving the receipt, nothing more than this can, in my judgment, under any circumstances, be demanded of him, unless indeed he has failed to properly care for and store the goods, a point not involved in this case.

The words "mess pork," in this receipt, are clearly words of description. They are descriptive of the barrels received, and inserted for the purpose of identification. They signify no more in that connection than that the fifty-four barrels received, and which are to be delivered to the bearer on return of the receipt and payment of storage, are described, marked or

known as barrels of mess pork. They do not signify that the barrels actually contain that article to the knowledge of the warehouseman, or that he so states or represents to any person purchasing the property by taking delivery of the receipt. Neither do they signify that he has any actual knowledge or information upon the subject, or that he so states or represents, except so far as the barrels themselves, by their external appearance, size, weight, marks, etc., indicate such to be their contents. He receipts them upon the representation of the bailor, and their external appearance corresponding therewith as to contents. He does not, and is not supposed to have any actual knowledge of their contents, and the language of the receipt is not so to be understood. It is no warranty on his part as to the actual contents, but only that the barrels are so represented and so appear to him, to the extent of his knowl-edge or means of information on the subject; and as they are represented and appear to him, so he represents or describes them to others in his receipt. A warehouseman like a common carrier, is not authorized to open and inspect barrels or packages delivered to him for safe keeping. A carrier cannot do this, or insist on its being done, before signing the receipt or bill of lading; and the usages and course of the business with warehousemen are the same.

That such is the legal obligation and duty of the carrier, unless under certain circumstances, as where he has good reason to believe that the package tendered contains something dangerous, or hurtful, or otherwise of a character not proper to be carried, was expressly decided in *Couch v. The London & Northwestern Railway Company*, 11 C. B., 255 (78 E. C. L., 254, 290, 292, 294). See also the language of Lord CAMPBELL, C. J., in *Bross v. Maitland*, 6 El. & Bl., Q. B., 482 (88 E. C. L., 482), and the opinion of SAWYER, J., in *Barrett v. Barney*, 2 Abbott's U. S. Cir. & Dis. Ct. R., 197; *S. C.*, 3 Albany Law Journal, 246, 247. And of necessity this must be so; for, otherwise, business of the kind could not be transacted. The usages and course of

business of warehousemen in this particular were clearly proved in this case, and, besides, are well known and understood in commercial circles, if not in courts, without such proof. And here again the complete and perfect analogy between a ware-houseman's receipt and the receipt or bill of lading of a common carrier holds good, so that in all respects, except the single one that one is to move the goods and the other is not, the contracts are precisely alike. In saying this, of course, I do not intend to reject or overlook the difference in the liability of the two, as settled and understood in our law. But that difference, the carrier being under far the more stringent and exacting rule, would seem, if anything, to make in favor of the increased negotiability of the carrier's receipt over that of the warehouse-man. And when we add to this circumstance the further well known fact, that carriers' receipts always have circulated, and necessarily always must circulate and be negotiated and transferred far more widely and extensively than those of warehouse-men, it seems impossible to conclude that there exist any reasons, either in law or in the necessities or convenience of trade or commerce, for ascribing or giving to the receipts of ware-housemen any greater negotiability, or any further or different properties or qualities in the hands of any person, than are ascribed or given by law and the usages and customs of merchants to the receipts of carriers.

I know of no authority, and do not think any can be found, to justify or uphold the contrary of this proposition, and I certainly can see no good reason for upholding it. The books, to the extent of my examination — and I believe I am correct about it — make no distinction between the two instruments so far as their negotiable qualities or characteristics are concerned. The English courts place both on the same footing, as will be seen by the discussion and references in *Coleman v. Riches*, 16 C. B. (7 J. Scott), 104, [81 E. C. L., 103], which was a case upon a wharfinger's receipt; and so do the courts of this country, in which it has been held that the endorsement and deliv-

Hale and others vs. Milwaukee Dock Company.

ery of the warehouse document transfers the legal title and constructive possession of the property. It is a good symbolical delivery, equivalent, in the then situation of the property, to the delivery of the property itself. *Rice v. Cutler*, 17 Wis., 351; *Gibson v. Stevens*, 8 How., (U. S.) 399, 400; *Gibson, Stockwell & Co. v. Chilicothe Bank*, 11 Ohio St., 311.

Having thus concluded that there is no difference, and no distinction can be made, between this receipt and the receipt or bill of lading of a carrier, with respect to negotiability, and that it is negotiable to the same extent, under the same circumstances, and upon the same principles, as a carrier's receipt, I shall next endeavor to show, if it were a carrier's receipt and the defendant a carrier, that a delivery or offer of delivery, in good order, to the plaintiffs as assignees or *bona fide* holders for value of the receipt, of the same identical barrels for which the receipt was given, would have absolved the defendant from all further liability upon the contract, and would have been an exact and legal performance of it.

If this had been a carrier's receipt in the same words, except to provide for the carriage and rate of compensation, and containing, in addition to the description, "fifty-four bbls. mess pork," the further statement or description "in good order and well conditioned," it would not then have constituted a warranty or representation binding the defendant that such were the actual contents of the barrels, and such actually the order and condition of the pork in them. It is settled, beyond reach of cavil or doubt, that these and all like expressions or statements contained in the bill of lading or receipt of carrier, relate only to "circumstances which are open to inspection and visible" to the carrier at the time; but they do "not preclude the carrier from showing, in case of loss or damage, that the loss proceeded from some cause which existed, but was not apparent, when he received the goods, and which, if shown satisfactorily, will discharge the carrier from liability." This is the language of Chief Justice SHAW, in the third position stated in *Hastings*

*v. Pepper*, 11 Pick., 43, and which is quoted with such decided approbation by the supreme court of the United States in *Nelson v. Woodruff*, 1 Black, 160. And besides these two cases, fully to the point, Mr. Justice COLE, in the former opinion, refers to four others, which are equally so, viz.: *Shepard v. Naylor*, 5 Gray, 591; *Tarbox v. Eastern Steamboat Co.*, 50 Maine, 339; *Bissel v. Price*, 16 Ill., 408; and *Bradstreet v, Heran*, 2 Blatchf, 116. And now, on this argument, the learned counsel for the plaintiff, cite still others (*Blanchard v. Page, supra*; *Sears v. Wingate*, 3 Allen, 105, and *Berkley v. Watling*, 7 Ad. & Ellis, 29, 34 E. C. L., 22 ); but the counsel say that all are cases arising *between the original parties to* the *bill of lading*.

The answer or argument, then, is this, that the rule or principle of construction is inapplicable when the bill of lading or receipt has been transferred, or, in other words, that it is to receive one construction as between the original parties to it, and another and very different construction as between third persons. As between the original parties, and as intended by them at the time of making and signing the instrument, the language is to be understood and applied only to those facts and circumstances which were open to inspection and visible to the carrier, so that the carrier may rebut the *prima facie* case made against him, by showing latent defects, or that the contents were not what they purported or were represented to be; but, as between the carrier and third persons, a different construction must prevail, and the words must be understood and applied, not to the facts and circumstances as they appeared externally and were seen by and represented to the carrier—the open, visible condition of things — but to those facts and circumstances which were hidden from and unknown to him, and which he could not know — to the true and actual contents and internal condition of the packages or parcels, so that the carrier shall be estopped or absolutely concluded with respect to them by the language of his receipt. It would be something very strange, to say the least of it, and I think new, if the language

of a written instrument were to be held thus susceptible of two entirely different and contrary constructions. It would seem that the words of a writing, expressing the understanding and intent of the parties to it, ought to mean the same thing and express the same understanding and intent, whether the writing itself is in the hands or possession of one person or another. And so I think they do, and I think the learned counsel are entirely mistaken in the position they assume. It is not enough for them to show, in order to establish authority in their favor, that the cases are all between the original parties to the bill of lading or receipt in which the courts have applied this principle or rule of construction, but they must go farther and show that the courts have refused to apply the same principle or rule of construction as between the carrier and third parties. This they have entirely failed to do; and it is believed, by me at least, that it cannot be done.

It will be observed, in examining the cases above cited, that the courts lay down the principle or rule generally, or as generally or always applicable; and that they do not anywhere state or suggest the exception or distinction contended for by counsel. Such a distinction is not anywhere hinted at, and it is clear to my mind that there is no good reason or foundation for it. On the contrary, the very opposite position, and that there exists no such distinction, is clearly stated and shown by some of the cases. The second rule laid down in *Sears v. Wingate*, 3 Allen, 107, and which applies to the point now under consideration, is in these words: "The master is estopped, as against a consignee who is not a party to the contract, and as against an assignee of the bill of lading, when either has taken it for a valuable consideration upon the faith of the acknowledgments which it contains, to deny the truth of the statements to which he has given credit by his signature, *so far as those statements relate to matters which are, or ought to be, within his knowledge.*" This is a clear statement and recognition of the true and just limit or extent of the carrier's liability to third

persons, and of the correct rule or principle of construction in such cases.

And counsel are mistaken too, I think, when they assert that all are cases arising between the original parties to the contract. The case of *Nelson v. Woodruff*, 1 Black., 156, also cited by counsel, was not such an one. It was a controversy between the carrier and, in the language of the above rule, a consignee who was not a party to the contract, and who had taken it for a valuable consideration, upon the faith of the acknowledgments which it contained. Such a consignee, who advances money upon the faith of the bill of lading or receipt after it is made out and delivered to the consignor, stands in the same relation to the carrier, and is entitled to the same protection, as an assignee or holder in good faith for value of the bill of lading. But the court in that case refused to hold the carrier liable for secret defects, or leakage, or loss of contents arising therefrom, or for diminution or absence of contents, unknown to the carrier at the time the goods were shipped. The bill of lading recited that the barrels and tierces "had been shipped in good order and condition," etc. That case is an authority clearly against the position here assumed by counsel.

And so also is the case of *Marden v. Green*, 6 Watts, 421, likewise referred to most approvingly by the court in *Nelson v. Woodruff*, and with which it was said Mr. Angell had made us all familiar. The following language occurs in the opinion: " Some difficulty arose as to whether the owners could contradict the bill of lading. This is not generally permitted, but cases may occur in which it may be proved there was imposition on the captain, or a mistake of both consignor and captain. *The captain does not open or otherwise examine the casks. Suppose he receives a barrel of corn instead of a barrel of coffee; or a barrel of cider instead of Madeira wine; or a package of cotton linen instead of flaxen linen; it would seem his bill of lading would not and ought not to exclude him from proving this, whether it arose from mistake or fraud in the consignor.*" Here then we have the

court supposing, in the case of a bill of lading or carrier's receipt, a transaction or occurrence of the same kind which actually took place in this instance with the warehouseman and his receipt, and stating, as an undoubted general proposition of law, that the carrier or master in such case could explain the circumstances, and exonerate himself from liability by showing the fraud or mistake of the consignor. If the carrier could do so in such case, then why not the warehouseman? I have endeavored to show that there exists no just or solid ground for discrimination. And the language of the court in the early case of *Barrett v. Rogers*, 7 Mass., 300 — "if no fraud or imposition was practiced," etc.— is also directly to the point.

And to the same effect is all the reasoning of Mr. Justice NELSON in *Bradstreet v. Heran*, where, as he says, the respondents in that case, who were the consignees of the cotton, stood in the light of *bona fide* purchasers, who became such on the faith of the representations contained in the bill of lading. He states the question there to have been, whether the loss and injury existed in the shape of external damage, at and previous to the loading of the cotton on ship-board, and was readily visible on inspection; or whether the damage was occasioned by the internal bad condition of the cotton, which was invisible to the eye at the time of the shipment, and could only be detected by cutting and inspecting the bales. The court found that the damage was of the former kind, and so decided against the carrier.

And in *Bisset v. Price*, the party suing had made advances on the faith of the bill of lading. The principles governing in such cases are ably discussed, and the court say: "The forwarding business would become impracticable if the carrier, when he receives the goods, is bound to open and examine every package, before he signs the bill of lading for them." And such, also, I understand to have been the case of *Shepherd v. Naylor*, where Chief Justice SHAW says: "In general the interior condition of goods, packed as usual and necessarily so

for shipping, cannot be known to the· shipmaster receiving them for carriage, and therefore the words 'in good order and condition' must be limited to their apparently good order and external condition.   It is not unusual to insert in the bill of lading, 'contents unknown,' or some saving clause of like effect.   But in *Barrett v. Rogers*, 7 Mass., 297, the court held *that such must be the reasonable construction where no such words were used*, and therefore held that the receipt and undertaking expressed in a bill of lading are *prima facie* evidence of the quantity, quality and condition of goods received for carriage, but not conclusive.   See also *Clark v. Barnwell*, 12 How., 272; *Haddow v. Parry*, 3 Taunt., 303."

It would seem that I might pause in the consideration of this case just here, and that enough has been said to show that, in my judgment, the plaintiffs cannot recover.   But as the great question argued in the case was that of negotiability, and as it was claimed for the plaintiffs that these receipts are negotiable, like bills of exchange or promissory notes, or like bonds for money payable to bearer, and passing from hand to hand by delivery, and as I concede their negotiability to the same extent and for the same purposes as bills of lading or carrier's receipts are or may be said to be negotiable, it is necessary and proper that I should speak more particularly on that subject.   A bill of lading or carrier's receipt is not negotiable like a bill of exchange or promissory note, within the meaning of the law merchant.   The indorsement or delivery of it does not convey the contract itself, but only the property represented by it.   It is the property which is transferred by the indorsement and delivery; and, in the hands of the indorsee or holder, the bill of lading becomes mere evidence of his title or ownership.   He can demand, sue for and recover the property, producing the bill of lading or receipt in proof of title.   The carrier must deliver the property to him as the owner, and he can maintain an action against the carrier, founded on his right of property, if he does not do so.   He cannot, however, sue upon the bill of

lading as a contract, for in that he has no interest except as a muniment or evidence of his title to the property. These conclusions seem necessarily to follow from the nature and · terms of the instrument, being a mere contract of bailment, which is to be fulfilled or performed by the delivery of the identical property specified or received. It seems impossible to liken such a contract to, or to infuse into or affect it with the properties or qualities of negotiable paper, properly so called. But I need not dwell on these matters, as the question is conclusively settled by the decision *Thompson v. Dominy*, 14 Mees. & · Nels., 403. Nor need I enter into the reasoning of the judges, so clear and satisfactory, in that case. I prefer rather to quote the language of Chief Justice SHAW in *Blanchard v. Page*, 8 Gray, 297. He says: " It has sometimes been insisted that a bill of lading is negotiable, like a bill of exchange, so that when the shipper has indorsed and delivered the bill of lading, his whole right and interest, as well in the contract as in the goods represented by it, is gone. Something like this has been suggested in some of the earlier cases, of *Lickbarrow v. Mason*, and others, but has never, we believe, received the sanction of judicial decision.

" But it is now fully settled, that a bill of lading is not negotiable in the sense stated, so as to constitute a legal obligation between the ship-owner and the indorsee; though in many cases of the indorsement of the bill of lading, whilst the goods are in the possession of the carrier, of which the shipper is owner, or the goods have been shipped on his account, the effect is to transfer the right of possession connected with the right of property, in virtue of which, as before stated, the indorsee may have his remedy as owner. But in law, the original contract of the carrier with the shipper is like any other right or chose in action: it may convey an equitable interest, but cannot transfer the legal right of action.

" This question came before the court in a comparatively recent case, *Thompson v. Dominy*, 14 M. & W., 403, in which it

was held that a bill of lading is not negotiable like a bill of exchange, to enable an indorsor to sue in his own name; the effect of the indorsement being only to transfer the property in the goods, but not the contract itself. It was put expressly on the ground, that the original contract for safe carriage is with the shipper, and that contract is not transferable, although an indorsement of the bill of lading by the consignee, who has in himself the right of property in the goods, will pass the right of property to the indorsee, with all the rights incident thereto. Since that decision, by an act of parliament, St. 18 and 19 Vict., c. 111, a bill of lading has in effect been made transferable by indorsement, so that an action may be brought upon it in the name of the indorsee. The statute, of course, cannot affect the law of America."

The act of parliament above spoken of, and which only makes the bill of lading transferable by indorsement "as against the master or other person signing the same," has been before the English courts, for consideration in two recent cases. *Valieri v. Boyland*, L. R. 1 C. P., 382 ; *Jessel v. Bath*, L. R. 2 Ex., 267. The act is printed at length in a note to the former case, and contains a proviso in these words : " *Provided* that the master or other person so signing, may exonerate himself in respect of such misrepresentation, by showing that it was caused without any default on his part, and wholly by the fraud of the shipper, or of the holder, or some person under whom the holder claims." It appears, therefore, under the act, that cases of this description, if this were a bill of lading and negotiable, are saved, as they obviously should be, from its operation, or from the effect given to the transfer of negotiable paper to a purchaser for value without notice. And so the courts held in the cases referred to.

The provisions of our code relating to the assignment of choses in action and the bringing of suits thereon in the name of the real party in interest, do not effect the question. If assignable, and if the assignee of the bill of lading may sue in

his own name, he can only recover as his assignor, or the original party, could recover upon it. He represents such party, and succeeds only to his rights at the time of assignment. *Hedges v. Sealy*, 9 Barb., 214.

I should not close this opinion without reference to the recent well considered decision of the supreme court of our sister state, Minnesota, which fully sustains the views I have taken, and is not cited in the briefs of counsel. It was a case much like the present, a suit for property specified in a warehouseman's receipt, which receipt had been transferred; and the action was by the holder against the warehouseman. The case is *Robson v. Swart*, 14 Minn., 371. I concur in the general principles there held, but the decision goes much farther than we are required to go in this case. The wheat was open to inspection, and the warehouseman supposed to know its quality. The receipt was for "No. 2 wheat," and I doubt, therefore, whether the tender of wheat of a quality inferior to No. 2, though the same wheat for which the receipt was given, ought to have been held a satifaction of the contract, or discharge of the obligation of the warehouseman to a holder for value of the receipt, who bought without knowledge of the quality of the wheat, except as stated in the receipt, and relying upon such statement.

The case of *McNeil v. Hill*, Woolworth's Cir. Ct. R. (vol. 1), 96, cited by counsel for the plaintiffs since the above was written, contains nothing in conflict with the views I have taken. I fully agree that the case was correctly decided, and refer to it as sustaining my conclusions here, so far as it has any application to the questions under consideration. And two recent cases, one in Illinois and the other in Ohio, are fully to the point, and I make especial reference to them. *Burton v. Duryed*, 40 Ill., 320; *Second Nat. Bank v. Walbridge*, 19 Ohio St., 419; *S. C.*, 2 American R., 408.

And the case *In re Bahia & San Francisco Railway Co.*, L. R., 3 Q. B., 583, in like manner cited, is clearly distinguishable. The certificates of shares there issued by the company were in-

tended to, and did, not only certify that the persons therein named were on the register of the company as shareholders, but also that they were in reality shareholders. They were expressly declared by statute to be *prima facie* evidence of the title of the persons named to the shares specified.

Every light in which this case presents itself to my mind, compels me to say, that the judgment should be reversed, and that the plaintiffs have established no cause of action.

The other justices concurring, the judgment is reversed, and a *venire de novo* awarded.

A motion for a rehearing was denied, and the following opinion delivered, at the January term, 1872:

DIXON, C. J. Counsel for the plaintiffs move for a rehearing, and ask a decision whether warehouse receipts are not negotiable by ch. 340, Laws of 1860, and the amendment, sec. 1., ch. 73, Laws of 1863 (2 Tay. Stats., 1846, 1847, §§ 42, 45 and 46). An examination of those statutes, and particularly of the provisions of § 45, which are chiefly relied upon, will show that they contain no words making the receipt itself transferable like a bill of exchange under the custom of merchants, or as promissory notes have been declared to be by statute. The transfer of the receipt "by delivery, with or without endorsement thereof," transfers no more than the property in the goods; it does not transfer the contract. This is so by the very language of the enactment, which is that "any person to whom the same may be *so transferred,* shall be deemed and taken to be *the owner of the goods, wares and merchandize therein specified,* so far as to give validity to any pledge, lien, or transfer made, or created, by such person or persons."

This language very clearly points out the extent and quality of negotiability which the instrument has by the statute, the object of which was, as is shown in *Rice v. Cutler,* 17· Wis., 358, to obviate the inconveniences which resulted from the rule that

agents, factors and others, having only a special authority to sell or special property in the goods, could make sale only in pursuance of such authority or according to their special interest, although, by the possession of the bill of lading or receipt, they were clothed with apparent full power, or had an apparent absolute title which they might seemingly transfer or deal with as if the goods were actually and truly their own. This appearance was regarded as deceptive and mischievous; and it was to remedy the evils arising from it, by making the *apparent* authority equivalent to a *real* authority, in all cases where the ends of justice demanded, that the statutory provision was enacted. Under the statute, persons thus entrusted with evidences of title, or of authority to sell and dispose of, though having no title and without authority or with but a special or limited power, may, nevertheless, sell and convey title to the goods generally, by the transfer and delivery of the receipt, as if they were the real owners. They may make a valid pledge of, or create a valid lien upon the goods by the same means. Such is the more extended effect given by the statute to the transfer of the receipt to a *bona fide* purchaser for value, or to one who has in good faith received it in pledge of the goods, or otherwise as security for the payment of money, or the discharge of some promise or obligation. More than this the statute does not change or affect the negotiable or *quasi* negotiable character of such instruments, but leaves them as they were before its enactment.

The delivery of the receipt may operate to transfer and vest the title of the goods, or create a valid lien or pledge, where before it would not; but in all other respects the nature of the instrument is untouched; and when the words "not negotiable" are employed in the statute, they necessarily refer, as it seems to us, to that kind of negotiability recognized and defined by the statute, and which is the very same the instrument possessed before the statute was enacted. The word "negotiable" is evidently not used in the sense in which it is used as

applicable to a bill of exchange, but as passing the property in the goods only, and we can give no other effect to the statute.

It follows that the plaintiffs in this case are not aided by the statute, and that a motion for a rehearing must be denied.

*By the Court.* — Motion denied.