ROBERT J. DEAN et al., Respondents, v. MARSHALL S. DRIGGS, Appellant.

*Supreme Court, First Department, General Term, November 7, 1889.*

1. *Warehousemen.   Liability.*—A warehouseman is liable, under chap. 326 of 1858, as amended by chap. 440 of 1866, to a *bona fide* holder of a receipt, if the package does not contain the article named in the receipt.
2. *Same.*—His want of knowledge does not relieve him from liability.
3. *Same.*—He is not exonerated by delivering the package received with its contents.
4. *Same.*—Where the receipt does not state the quality, his obligation is performed, if the article delivered answers the description of the commodity named, though of an inferior quality.
5. *Same.*—The recovery in such case is limited to the immediate and consequential damages which have been sustained by reason of the commodity not conforming to or being of the description mentioned in the receipts.

Appeal from a judgment entered on the verdict of a jury and from an order denying a motion for a new trial.

*John Berry*, for appellant.

*Chas. Blandy*, for respondents.

DANIELS, J.—The action has previously been before this court upon an appeal from a judgment dismissing the complaint. As the evidence was then presented the case was regarded as one for the jury, and the judgment was directed to be reversed and a new trial had. Dean v. Driggs, 44 Hun, 480.

The trial upon which the present judgment has been recovered took place under this direction, and to sustain the appeal the court has been urged to reconsider the point upon which the liability of the defendant has been made to depend. He was a warehouseman, and received into his ware-

house upwards of 2,463 barrels described as containing cement. For these barrels receipts were issued by him, which were afterwards surrendered. Small quantities of the article were taken from the warehouse, and two other receipts finally executed and delivered by the defendant to Max Von Angern.

These receipts stated the article to be cement, Portland, in one instance, and Portland cement in the other. One of the receipts was for 963 barrels, and the other for 1,500 barrels, and each in the same form declared the property " to be delivered to his order on return of this receipt and payment of storage." Von Angern borrowed money of the Chemical National Bank, and hypothecated the receipts for the security of the loan. They were regularly endorsed for that object. The plaintiffs also guaranteed the payment of the loan, provided the security should be delivered to them upon the performance of their guaranty. The debtor failed to pay the debt, and the plaintiffs, under their guaranty, were called upon for its payment, and paid the loan, taking up these receipts for their own protection from the bank.

The position taken on behalf of the defendant is the same now as it was upon the preceding appeal, that he should not be held liable for the delivery of the kind and description of property mentioned in the receipts, but that he should be exonerated from liability by delivering the packages, with their contents, which have been received by him in store. The case of Hale *v.* Milwaukee Dock Co., 29 Wis. 488, has been relied upon as authority sustaining this position. In that case the receipt was given for fifty-four barrels of mess pork. But it finally turned out on examination, that this was not the contents of the barrels, but they contained only salt. And it was determined by the court that the defendant delivering the receipt performed its agreement by its readiness to deliver the barrels with the salt. In that state a statute very similar to the laws of this state had been enacted, and was in force at the time of the transaction

forming the subject of the litigation. But the case does not appear to have been disposed of, or decided, upon the effect of the statute, but upon a very extended examination of other decided and reported authorities.

And it was there concluded that the warehouseman was bound to do no more in the performance of his obligation than to deliver the article received by him. But the present case has been regarded as falling within a more rigid rule of liability on the part of the warehouseman by reason of the enactment of chap. 326 of the Laws of 1858, as that was amended by chap. 440 of the Laws of 1866. By the first section of this act, warehousemen were prohibited from issuing any receipt, or other voucher, "for or upon any goods, wares, merchandise, provisions, grain, flour, or other commodity, to any person or persons purporting to be the owner or owners thereof, or entitled, or claiming to receive the same, unless such goods, wares, merchandise, provisions, grain, flour, or other commodity, shall have been actually delivered into the store, or upon the premises of the person issuing the receipt." And the statute has not left the warehouseman at liberty to issue the receipt upon the articles delivered to him being apparently of the description mentioned in the receipt, but it has prohibited the receipt from being given, unless the goods, wares, merchandise, provisions, grain, flour, or other commodity, shall have been actually received into the store. The language is entirely plain and free from ambiguity, and seems to leave no room for construction. And where that is the case, it becomes the duty of the court to follow it as it has been employed, and to carry it into effect as that has been declared by the legislature. And no more than that was done by the decision already made, holding the defendant to have violated this prohibition, if the commodity mentioned in the receipts was not of the description known as Portland cement. And it was regarded as following from the language of the act, that the defendant became liable to parties receiving the receipts.

in good faith, and for value upon the endorsement of the person in whose favor they were issued, if the commodity mentioned was not Portland cement. The law itself made the receipts negotiable by endorsement, as long as they were not stamped, or stated to be, not negotiable to the defendant. This liability was also considered to be sanctioned and warranted by the last branch of the seventh section of the act as it was finally amended. This part of the act has not in any sense rendered the liability dependent upon the knowledge of the warehouseman that the article was not of the description mentioned in the receipt.

To make it an indictable offense to issue false receipts, the first branch of this section requires that the law shall be willfully violated. But this term, willfully, has not been employed in that part of it declaratory of the liability of a warehouseman to an action for damages. And it was evidently omitted in this connection by the design and intention of the legislature.

As the law was first enacted in 1858, even a willful violation of its provisions was not in language rendered essential for the creation of a criminal liability. But any warehouseman or other person, who should violate any of the preceding provisions of the act, was then declared to be deemed guilty of fraud, and upon his conviction liable to be fined and imprisoned. And after that followed the same clause declaratory of his liability in a civil action for damages. The section remained in this form until the enactment of the law of 1866, when this term, willfully, was added to the branch of the section declaratory of the criminal liability. And it is entirely clear that this was done as a qualification only of the act denominated a crime. As to the remaining part of the section prescribing the civil liability of the warehouseman, no change was made. As the attention of the legislature was in this manner directed to the section, and they changed only the former part of it, it is no more than reasonable to infer that the term, willfully, was omitted from

the latter branch of the section for the reason that it was intended that the warehouseman should remain civilly liable whenever he violated the prohibition contained in the first section of the act as it was originally enacted. And upon this ground this case is entirely distinguishable from the authorities upon which the decision in Hale *v.* Milwaukee Dock Co. proceeded.

The case of Robson *v.* Swart, 14 Minn. 371, is still more inapposite to this controversy. For there the receipt in fact agreed to no more than was to be implied from its very general description. And so it was considered by the court in the decision of the case. And what was said in Miller *v.* Hannibal, etc., R. R. Co., 90 N. Y., 430, as to the general law of the state, appears to support the effect which the statutes of the state, in force at the time when these receipts were issued, by their language, have been regarded as entitled to receive. That was an action upon a bill of lading for the value of eggs, stated in it to have been the contents of thirty packages or barrels. The barrels contained sawdust, and the company was relieved from liability only for the reason that the printed form of the bill contained the statement " Contents and value unknown." In the decision it was stated that ". The sole question is whether the description of the articles in the bill of lading was a representation by the carrier that the barrels contained eggs, because if this is the true construction of the instrument, the right of the plaintiffs to recover is unquestionable." Id., 432. In the present case the receipts were given in such form as to include the representation that the property to be returned was so many barrels of Portland cement. If it had not been intended by the defendant to create the obligation against himself to return that commodity, there was not the slightest difficulty in the way of avoiding that result, by adding that the contents of the barrels were unknown, or that they were described as barrels containing cement. It was entirely within the power of the defendant to avoid this liability by a simple

statement excluding the obligation to return any other than the commodity contained in the packages. But he did not do that. On the other hand he stated that he had received so many barrels of Portland cement on storage, and they were to be delivered to the order of the person named in the re·ceipts on the return of the receipts themselves and the payment of the storage. He placed himself voluntarily in the position, if the commodity was not Portland cement, where the person to whom the receipts were issued could defraud others dealing upon their faith and representations, unless the defendant should be held liable for the delivery of the article stated to have been received. And the rule is where one of two innocent persons is to suffer loss from the fraud of a third, the loss shall fall upon the individual who has placed the third person in the position and supplied him with the evidence through which the successful perpetration of the fraud could take place. The defendant is within the operation of this principle, and liable to make good the obligation expressed by the receipts by the delivery of the commodity mentioned in them, or the payment of their value.

The case was submitted by the court to the jury strictly according to this principle of liability, and they rendered a verdict in favor of the plaintiffs for the sum of $4,054.16. This verdict is assailed as having exceeded the support afforded to it by the evidence. To recover the verdict it was incumbent upon the plaintiffs to prove the extent to which they had sustained loss by the action which had been taken upon the faith of the defendant's receipts. To entitle them to recover at all, they were bound to prove that the barrels did not contain Portland cement. This article was shown to be manufactured in England, France, Germany, Belgium and the United States. It derived its name and description from the ingredients from which it was manufactured, and its ability to set and become hardened in water. It was also stated to be of a peculiar color, known to persons engaged in its manufacture, sale or use. All the barrels in the de-

fendant's warehouse were at no time examined.   The extent
of the examination made by the witnesses sworn on behalf
of the plaintiffs did not exceed 118 of the 2,463 barrels in
store.   They did propose to extend this examination, but they
were not permitted to do so by the defendant's attorney, for
the reason that 120 barrels opened for that purpose afforded a
full opportunity to ascertain the character and condition of
their contents.   But this statement was not supported by the
evidence given on behalf of the defendant, indicating that
there were barrels forming a part of the mass that has been
stored in the warehouse which did contain cement denomi-
nated by the witnesses to be Portland cement.   One of the
plaintiffs, Mr. Wills, testified that he went to the warehouse
within three or four days after the maturity of the note, and
in October, 1885, and that he found the cement in a cellar of
the defendant's warehouse, and that it had been hardened.
His acquaintance with the article of Portland cement was,
that it was a floury substance when it was in a good condition,
and that he could, by looking at it, distinguish it from some
other kind of cement.

His statement further was, that " All I know about Port-
land cement is that I have seen an article in the market of a
certain character, floury condition, and coming in certain
packages known as Portland cement; and I have dealt in it
and sold it as such.   That is all I know about Portland
cement."   The barrels in the cellar of the defendant's ware-
house were stated by him to be tierced up three or four in
height, and running back through the cellar.   He further
added that he did not examine closely but he made an
examination of the barrels superficially, going around and
sounding them.   In this examination he found barrels with
staves broken, enabling him to look at the article.   And he
testified that he took up a stick and poked at it, and found
that it was a hard substance ; that it was a brown mortar-like
substance inside of the barrels, and that was the character of
all the barrels which he examined.   He could not, he swore,

push the stick beyond three inches in the barrels and the color did not resemble Portland cement. This was substantially all the evidence which was given by him as to the quality of the article contained in the barrels. And the number which he examined in this manner was not stated by him.

His evidence, therefore, was quite limited in the way of supporting the plaintiffs' action. The next witness examined upon this subject was Thomas R. Keator. He had formerly been a manufacturer and importer of cement, and made an examination of this article. But he testified that he could not tell whether the barrels contained Portland cement without making a test; that he took samples and made a ball test which he considered thorough, and then added that the commodity was not Portland cement. The reasons he afterwards gave for this conclusion were, that the article would not harden, but crumbled, and went to pieces. On that account he stated, "It was not a good cement. That opinion is derived from this test I spoke of." But the samples used by him were taken from two of the casks. They were obtained from the head of the casks, and he had no knowledge whether the cement would deteriorate by age. In his further evidence he stated that about ten tests had been made of the article, and that he had known Portland cement to harden while it was confined in the packages. His experience, he said was "that Portland cement does harden in the barrels, sometimes, quite often."

This testimony given by him materially diminishes the force of that given by Mr. Wills, who placed his judgment of the article upon the fact that it was a hard substance as he found it in the barrels which he examined. And it at the same time tends to establish the fact that the samples taken by himself from the barrels lacked the important quality of hardening under water. And to the extent of his examination it tended to prove the fact to be, either that this was not Portland cement, or that it had lost this, its most valuable quality. The witness, Alexander Keeler, stated

that he had opened half a dozen barrels of the cement, and bored down with a stick and an adze and found a substance like sand. These barrels had the trade-mark, or brand, of a manufacturing firm in France engaged in the manufacture of cement. He found the article to have hardened ; that it had not the color of Portland cement. It fell to pieces instead of hardening under water, and only in the appearance of the packages resembled Portland cement. The witness, Thomas Keyes, opened 110 barrels and went down half way into the barrels. He testified that the substance was not like Portland cement. It was a different substance altogether, and he never saw Portland cement like it.

Further testimony was given by John J. Tucker, who was sworn on behalf of the plaintiffs, and was a builder. He previously examined the cement for another party, receiving twenty barrels of it, which he used in his business. His description of it was that it was very granular, more so than Portland cement, or any other cement, and of a very high color, and comparing in substance with anything he had previously used. He did, however, use these barrels, although he found them to be solid all the way through. And he added at the close of his testimony that he would not swear that this was not Portland cement, although it was different from any he had seen before. This was all the evidence given on behalf of the plaintiffs to prove the fact that the 2,463 barrels in controversy contained a substance different from that of Portland cement.

On the part of the defendant it was proved by the importer that this article was imported by him from France, and that he had paid its purchase price, and placed it in the warehouse of the defendant. He seems to have acted in good faith, and upon the belief that the barrels contained Portland cement.

Other witnesses were examined who testified to the fact that they had obtained samples from some of the barrels, and had subjected it to the process under which cement of this

description was expected to harden, and that this cement had hardened, although not as thoroughly as the best quality of Portland cement. It does not appear that these persons obtained the samples used by them from the same barrels as those which were mentioned by the witnesses on behalf of the plaintiffs. And it is not probable that they did, for the reason that the action of the commodity used by them was entirely different from that obtained by the plaintiffs' witnesses. There was no substantial conflict between the witnesses sworn on behalf of the plaintiffs and those sworn on behalf of the defendant.

For in the samples obtained by them, and the barrels which were examined, the article proved to have been different, indicating that the barrels in store with the defendant did, so far as the observation of his witnesses extended, contain Portland cement. And as the evidence on behalf of the plaintiffs referred to no more than from 118 to 120 barrels of the cement, and the fact was made to appear by the evidence of the defendant that some of the barrels certainly did contain Portland cement, it was not sufficient to justify the general verdict for the amount rendered by the jury. The most that the evidence tended to establish as to the quality of the article was, that a part of it proved to be a different substance from that mentioned in the receipts ; while the evidence given on behalf of the defendant has clearly and satisfactorily proved that another portion of the packages contained Portland cement.

It is true that this was of an inferior quality, but by the receipts the defendant did not bind himself to deliver any particularly described quality of cement. What he undertook to do was to deliver, upon the return of the receipts and the payment of the storage, the article known as Portland cement. And if it was of that description, although inferior in quality, the delivery of that article would be a performance of his obligations.

If the substance was not, in fact, Portland cement, and

that was for the plaintiffs to prove, it would seem to be sus-
ceptible of very satisfactory evidence. But the examina-
tions which were made, and the tests applied prove no more
than a probability that the article was in part only as the
plaintiffs affirmed it to be. While on the part of the defend-
ant it was equally as well established that the packages in
part certainly were of the quality represented by the re-
ceipts. The proof taken together was too loose, as a matter
of fact, to sustain the large verdict rendered by the jury.
The amount of the plaintiffs' demand was $3,500, together
with the interest accruing upon it from the time of the ma-
turity of the obligation. And so far as the action is capable
of being maintained, it is required by the statute to be lim-
ited to the immediate and consequential damages which the
plaintiffs sustained by reason of the commodity not conform-
ing to or being of the description mentioned in the receipts.
That they had sustained damages to the extent awarded by
the jury from the brief and imperfect examinations of the
article which had been made, has not been maintained. The
verdict should, therefore, be set aside, and the judgment
vacated, with costs to the defendant on the appeal from the
order to abide the event, and upon payment by him of the
costs of the trial already had.

BRADY, J., concurs.

VAN BRUNT, P. J.—I am of the opinion that under the
facts of this case no recovery should be had.

A mere allegation by a warehouseman that the goods are lost or stolen,
does not cast the burden upon the owner of proving that it could have been
prevented by the exercise of due care.   Leoncini v. Post, 37 N. Y. St. Rep.
255.

The liability of the defendant, under evidence and agreement, was held,
in this case, to be only as warehousemen and not as carriers.   Draper v.
Pres., etc., 118 N. Y. 118; aff'g 42 Hun, 654.

His liability as warehouseman depends upon the negligence of himself, his agents and servants. Id.

A warehouseman is liable for an unexplained failure to deliver goods on demand. Williamson *v.* N. Y., N. H. & H. R. R. Co., 56 N. Y. Supr. 508.

The liability of a warehouseman for stolen goods, stated. Id.

A warehouseman, who issues a receipt to an unauthorized person, obtains no title as a subsequent endorsee thereof, against the assignee of the con-signee. D. L. & W. R. R. Co. *v.* Corwith, 60 Hun, 576.

A warehouseman, under chap. 326 of 1858, as amended by chap. 440 of 1866, is liable to a *bona fide* holder of a receipt, if the packages do not contain the articles stated in such receipt. Dean *v.* Driggs, 54 Hun, 637. This liability is not dependent on his knowledge that the article was not of the description mentioned. Id. He is not exonerated in such case, by delivering the packages received with their contents. Id. But, where the receipt does not state the quality, if the article delivered answers the description of the commodity named, though of an inferior quality, the warehouseman's obligation is performed. Id.

A transferee of a warehouse receipt obtains no greater or other rights thereunder than the person to whom it was originally issued. Dean *v.* Driggs, 44 N. Y. St. Rep. 402; Whitlock *v.* Hay, 58 N. Y. 487. The language of the statute is that such receipts may be transferred by endorsement thereof, and any person to whom the same may be transferred shall be deemed and taken to be the owner of the goods, wares and merchandise therein specified so far as to give validity to any pledge, lien or transfer made or created by such person or persons. Id. The statute simply provides that the title to the property therein mentioned may be transferred by the endorsement and delivery of the warehouse receipt. Id. This does not make such receipt negotiable in the sense in which the word is used when applied to commercial paper. Id.

In the case above cited, it was held that a warehouseman was liable to a *bona fide* endorsee of a warehouse receipt issued by him for a false statement therein in relation to the contents of the packages for which it was given, irrespective of his knowledge that the article was not of that description.