CITIZENS' BANK *v.* ARKANSAS COMPRESS & WAREHOUSE COM-

PANY.

Opinion delivered July 9, 1906.

1. WAREHOUSEMEN—DELIVERY OF GOODS ON SURRENDER OF UNINDORSED RE-
CEIPT.—A warehouseman is not protected in surrendering the
property called for by his receipt to one in possession of such receipt,
unindorsed, which on its face shows another to be the owner. (Page
608.)

2. SAME—IDENTIFICATION OF GOODS.—Where a bank, holding bills of lad-
ing for certain bales of cotton, delivered them to a compress company
and took its receipt for the cotton, the fact that the compress company
mingled the bales of cotton delivered with a large number of other
bales did not divest the bank of its title, though identification of the
bales receipted for was thereby rendered difficult. (Page 610.)

3. SAME—TITLE OF PERSON HOLDING RECEIPT.—Where a compress company
accepted bills of lading for cotton from a bank and issued its
receipts in lieu thereof, in a suit in equity by the bank and others
against the compress company to settle conflicting claims to certain
cotton it was immaterial, as between the bank and the compress
company, whether the bank owned the cotton called for by the
receipts or merely held it as collateral security for a debt. (Page 612.)

4. CUSTOM—VIOLATION OF STATUTE.—As Kirby's Digest, § 527, provides
that no warehouseman shall transfer goods for which a receipt
has been given without the written assent of the person holding the
receipt, it is inadmissible for a compress company to prove a custom
to treat compress receipts as made to bearer in justification of
its action in delivering cotton to one in possession of such receipts
without indorsement from the person to whom the receipt was issued.
(Page 612.)

5. INTEREST—TIME FROM WHICH COMPUTED.—Where, in a contest between
a bank and others over the right to the proceeds of certain property,
it was agreed that the property should be sold and the proceeds
deposited in the bank to await the court's action, interest on the
amount deposited is recoverable only from the date of the judgment.
(Page 615.)

Appeal from Pulaski Chancery Court; *Jesse C. Hart,* Chan-
cellor; reversed in part.

STATEMENT BY THE COURT.

The Arkansas Compress & Warehouse Company is a cor-
poration, and during the years 1902 and 1903 was carrying on
business in Little Rock, Arkansas. During the cotton season
of 1902-3 the Compress Company handled a large amount of

cotton for different parties. Of the cotton which passed through the compress company's hands during that season 8,000 bales were placed on the books as belonging to W. H. McMurray & Company, about the same number of bales were credited to Geo. M. Miller & Co., and the Alphin-Lake Cotton Company had in its name about 7,000 bales.

The Alphin-Lake Cotton Company and the other firms named above were cotton buyers, doing business at Little Rock. A large part of the cotton purchased by these parties was paid for by money obtained from the different banks in Little Rock. The business was usually transacted in the following way: When the cotton was purchased, the purchaser gave to the seller a draft on the bank, to which was attached the bill of lading given by the railway company over which the cotton was shipped to Little Rock. The bank paid the check, charged the money to the buyer, and held the bill of lading as security. When the cotton was received by the compress company, it entered the cotton on its books as the property of the buyer, issued receipts in his name, and, with the consent of the purchaser, took up the bill of lading held by the bank and delivered to the bank the compress receipts issued in the name of the purchaser, which the bank held as collateral security for its loan in lieu of the bill of lading surrendered to the Compress Company. These compress receipts had no written indorsement on them at the time they were delivered to the bank, and were all in the same form, with the exception of the marks or tag numbers. One of them was as follows:

"No. 1,214.        .        (1) Bale.
"ARKANSAS COMPRESS AND WAREHOUSE COMPANY.
        "LITTLE ROCK, ARK., Jan. 15, 1903.
"Received for compression for account of Alphin-Lake Cotton Company one bale of cotton in apparent good order. No charge is made for storage on cotton covered by this receipt. Not responsible for loss by fire or other damage.
"Marks or tag number——.     No. Bales Cotton——.
"Ozark B-L 198.   H. T.      ZIBA BENNETT.
         "G. H. H., Secretary and Treasurer."

Before this action was commenced this receipt, which was held by the Bank of Little Rock, was indorsed on back as fol-

lows: "Alphin-Lake Cotton Company, per G. P. P." The words "Ozark B-L 198" on the receipt mean that the cotton was shipped from Ozark, and that the number of the bill of lading was 198. If the cotton was brought in Little Rock, the purchaser would obtain the money from the bank to pay for cotton by depositing the receipt of the Compress Company. The Compress Company, whether the cotton was bought here or shipped in, would also weigh and sample the cotton, place on each bale a tag number of the party in whose favor the receipt was issued, and furnish a list of the cotton, showing the weight and tag number of each bale, accompanied by a sample of each bale, which would be delivered to the person in whose name the receipt was issued, and a record of it was kept in the office of the Compress Company. When any one sold cotton that was in the compress, or shipped it out, he would simply deliver to the purchaser or railroad company receipts for so many bales, accompanied by what is known as a transfer sheet or turnout order, showing the tag numbers of the bales to be transferred or shipped out. This would enable the Compress Company to transfer the cotton on its books to the purchaser or ship out the cotton, as the case might be.

At the end of the cotton season of 1902-3 the Compress Company had taken up, in exchange for cotton in the usual way, all the receipts which it had issued during the season, except receipts for 129 bales, which had been issued to Alphin-Lake Cotton Company, and which were held by the Citizens' Bank as security for a loan to that company. The Compress Company had no cotton on hand in the name of Alphin-Lake Cotton Company to meet these receipts, but it did have on hand forty-six bales in the name of McMurray & Company and eighty-two bales in the name of Miller & Company. McMurray & Company and Miller & Company had no compress receipts to present for the cotton, but did have the turnout orders or transfer sheets. The Citizens' Bank had receipts calling for this number of bales, but it had no turnout order or transfer sheet for the cotton. The Compress Company refused to deliver the cotton upon the transfer sheets or turnout orders held by McMurray & Company and Miller & Com-

pany, unless they would at the same time tender receipts for that number of bales, and it refused to deliver the cotton to the Citizens' Bank without a turnout order or transfer sheet describing the cotton. Thereupon McMurray & Company brought an action against the Compress Company to recover 46 bales of cotton which was held by the Compress Company. Miller & Company brought an action in the chancery court against the Compress Company to compel it to account for 82 bales of cotton or proceeds therefor; while the Citizens' Bank brought an action against the Compress Company to recover the value of the 129 bales of cotton, for which it held the receipts of the Compress Company.

The Compress Company admitted that it had on hand 128 bales of cotton belonging to some of these parties which it was willing to turn over as the court might direct, and that it had lost one bale which it offered to pay for, but denied further liability. Two of the above actions were brought at law, but on motion the two cases at law were without objection transferred to the chancery court, and all three cases consolidated and heard together.

While the case was pending in the chancery court, the following order was entered:

"By consent it is ordered that the cotton in controversy in this suit be sold for the benefit of whom it may concern, and that the proceeds be deposited with the Citizens' Bank, subject to the order of this court; and if the money, or any of it, be awarded to any one of the parties other than the Citizens' Bank, the party to whom it is awarded shall be credited by the bank as of the date the deposit is made."

The cotton was sold and proceeds, $6,292.11, deposited accordingly. The court found against the bank and in favor of the other parties, except that the court refused to charge the bank with interest. Judgment was rendered against the Citizens' Bank in favor of Miller & Company for $4,178.50, and in favor of McMurray & Company for $2,113.61. The bank appealed, and Miller & Company and McMurray & Company took a cross appeal on refusal of court to charge the bank with the interest.

*Rose, Hemingway, Cantrell & Loughborough,* for appellant.

1. The holder of a lost or stolen warehouse receipt has no claim to the bailment, and the warehouseman who delivers the bailment on such a receipt must make good the loss. 101 U. S. 557. The receipts of Miller & Company and McMurray & Company were not indorsed, and were therefore not negotiable. Any one who stole or found them was in the attitude only of a thief or finder of personal property, and could transfer no title to them. 120 U. S. 38; Kirby's Digest, § 529; 13 N. Y. 121; 20 S. W. 949; 101 Ga. 329; 99 Ala. 140.

2. The Compress Company could not remove or permit to be shipped the cotton for which it had given its receipts, without the written assent of the bank, which it knew held the receipts and owned the cotton. Kirby's Digest, § 527.

3. There was no necessity for a particular or minute description of the cotton in the receipts. 59 Ark. 225; 31 Ark. 131.

4. Any custom that is in contravention of a statute is void. 29 Am. & Eng. Enc. of L. 376.

*W. S. McCain,* for appellees Miller & Company and McMurray & Company.

1. The custom relied on by the Compress Company was not established by the evidence; but if it were the custom, it is in the face of the statute, denounced as criminal, and can not avail as a defense. Kirby's Digest, § 531. Only a good custom can become law. 47 Ala. 362.

2. Bills of lading and warehouse receipts are treated as ordinary personal property, and the person accepting and giving value for them, especially where they are not indorsed, must assure himself that the custodian is the lawful owner. 4 Am. & Eng. Enc. of L. (2 Ed.) 549, 550; 1 Tex. Civ. App. 661.

3. Since the banks with which these appellees did business paid for the cotton bought by appellees respectively and held the receipts therefor, the legal title to all this cotton which these firms had in the compress was in said banks; and when appellees paid their indebtedness to the banks, they succeeded to the legal title. 59 Ark. 225.

*Ratcliffe & Fletcher,* for Arkansas Compress Company.

1. The rule that a custom can not contravene the statute can not be invoked in this case. All parties construed the meaning of the contract in accordance with the custom, and there is no conflict in the evidence regarding the custom as to compress receipts. The law as to the effect of such a custom is well settled. 19 Ark. 270; 46 Ark. 210; 58 Ark. 574; 56 Ark. 55; 46 Ark. 222. The receipts upon which the bank relies were not indorsed until after Alphin-Lake & Company had failed. They had already been transferred according to the custom, and no subsequent indorsement could have destroyed that which had been done in accordance with the custom. 120 U. S. 38; 99 Ala. 140.

2. A warehouse receipt is symbolic of the thing represented, and must identify the property. If the property can not be identified by the receipt, no title will pass by its transfer. 9 Am. Rep. 603; 50 *id.* 475; 29 *id.* 418; 137 Ill. 173; 103 Pa. St. 535; 67 Ark. 139.

3. If the receipts sufficiently describe the cotton, still the bank holds them subject to all defenses the Compress Company would have against Alphin-Lake Cotton Company, and to the terms of the original understanding that no cotton would be delivered without the surrender of the receipts *accompanied by a turnout order or transfer sheet.* 56 N. E. 732.

4. The Compress Company was required to exercise only ordinary care. 60 Ark. 65; 32 Ark. 225; 42 Ark. 200.

RIDDICK. J., (after stating the facts.) In this controversy three separate actions are involved. As these cases rest to a certain extent on the same facts, the parties consented that they should be consolidated and heard together by the chancery court. Without discussing the propriety of this practice, we shall proceed to consider the questions raised by the appeal.

First, as to the action brought against the Compress Company by Miller & Company to recover 82 bales of cotton and the action of McMurray & Company to recover 46 bales: The evidence shows that the identical cotton owned by these parties, and which had been deposited with the Compress Company by McMurray & Company, and receipts issued to them, was still held by the Compress Company at the time these suits were commenced. The books of the Compress Company show that

the 128 bales of cotton now held by the Compress Company belong to these plaintiffs; and while the receipts given to the plaintiffs were lost or stolen from them, it is admitted by the defendant that these receipts are now in its possession, having been surrendered to it by another party. But the Compress Company, for a defense against the claims of these parties to the cotton in its possession, alleges that it has already delivered to the party who surrendered to it the receipts issued for this cotton the number of bales called for by these receipts. It will be necessary to notice the circumstances under which this delivery was made.

The evidence shows that the Alphin-Lake Cotton Company had purchased and shipped to the Compress Company several thousand bales of cotton during the cotton season of 1902-1903. All of this cotton was purchased with money obtained from different banks. The Compress Company issued receipts for this cotton in the name of the Alphin-Lake Cotton Company, but it delivered the receipts, not to Alphin-Lake Cotton Company, but to the banks in exchange for bills of lading held by the banks, and the banks then held the receipts of the Compress Company as collateral security for the money advanced to the Alphin-Lake Cotton Company. Lake was the general manager of this company, and conducted its business at Little Rock. When he desired to ship any cotton held by the Compress Company, he obtained from the bank receipts for the number of bales he desired to ship, and the Compress Company would then ship the cotton out on his "turnout" order upon his surrendering receipts for an equal number of bales, without regard to whether these receipts had been issued or assigned to him or not. For, prior to this litigation, the receipts which the Compress Company gave for cotton contained only a meagre description of the cotton, and cotton standing on the books of the warehouse to the credit of one person would be shipped out on the order of such person upon his surrendering receipts issued to him or to any other person for a like number of bales. In other words, the Compress Company, the banks and cotton dealers dealt with these compress receipts as if they called for no particular cotton, but only for a certain number of bales of cotton.

While business was being carried on in this way, Lake found or obtained in some surreptitious way compress receipts for 128 bales of cotton which had been issued by the Compress Company to McMurray & Company for cotton deposited by them, and of which they had afterwards sold 82 bales to Miller & Company. At the time Lake came into possession of these McMurray receipts, he had at the compress warehouse a large number of bales of cotton which stood on the books of that company in his name, or in his firm's name. But the company knew that he had pledged the compress receipts issued to him for this cotton to the banks as security for loans, and they would not allow him to ship the cotton without the surrender of receipts covering the number of bales he desired to ship. Lake, then, in order to get possession of his cotton without paying his debt to the bank, presented these receipts of McMurray & Company which he had found. And, although the receipts had never been indorsed by McMurray & Company, and showed on their face that they did not belong to Lake, the Compress Company, relying on his honesty and supposing that he was the owner, took them up, and in exchange therefor turned over to Lake, not the cotton for which the receipts were given, but 128 bales which, though they stood on the books of the Compress Company as belonging to him or his firm, had, with knowledge of the Compress Company, been pledged to the bank by the deposit of the compress receipts issued therefor. Lake thus obtained 128 bales of cotton the compress receipts for which were held by the bank as security for its loan, and to which he had no right, and the Compress Company obtained from him compress receipts that he did not own and had no authority to surrender.

Although our statute makes such receipts "negotiable by written indorsement thereon and delivery in the same manner as bills of exchange and promissory notes" (Kirby's Digest, § 529), it does not follow that all the consequences incident to the indorsement of bills and notes before maturity ensue or are intended to result from such negotiation. That question was ably discussed by the Supreme Court of the United States in *Shaw* v. *Railroad Company,* and the rule stated that the finder of a bill of lading indorsed in blank could not by transfer divest the title of the owner.

*Shaw* v. *Railroad Company,* 101 U. S. 557. The same rule would apply to a lost warehouse receipt, for bills of lading and compress and other warehouse receipts stand in this respect on the same footing. *Hale* v. *Milwaukee Dock Co.,* 29 Wis. 482, 9 Am. Rep. 603. The compress receipt represents the property, and the transfer of the compress receipt by the owner transfers the title to the property. But a thief who finds a compress receipt can give no more title to a purchaser from him than he could to property which he had found or stolen. *Shaw* v. *Railroad Company,* 101 U. S. 557. If this is the law, even where the lost receipt had been indorsed in blank by the owner, as held by the Supreme Court of the United States in the case just cited, how clear it is that the finder of an unindorsed receipt, which on its face shows the name of the true owner, can not by selling or surrendering such receipt transfer the title of the owner. In this case the compress receipts issued to McMurray & Company which were found by Lake had never been indorsed, and carried on their face notice to any one dealing with them that they belonged, not to Lake, but to another. Lake not only had no title to them, but his finding and surrender of them to the Compress Company in no way affected the rights of the owners thereof or their title to the cotton which these receipts represented.

It is true, as remarked by the Supreme Court of the United States in *Shaw* v. *Railroad Company,* that the owner of a bill of lading or compress receipt may by his own carelessness put it in the power of a finder to occupy the position of an owner under circumstances that would estop such owner from setting up his rights against an innocent purchaser. In this case there is the suspicious circumstance that the manager of McMurray & Company, who was also a member of that firm, admitted that he had loaned or exchanged compress receipts with Lake on at least one occasion to enable Lake to ship out cotton which a compress company held. If he had loaned these receipts to Lake by which Lake obtained from the defendant Compress Company the 128 bales of cotton in controversy here, his firm would clearly be estopped to claim title to such receipts or cotton as against the Compress Company. But he testified positively that the receipts he exchanged with Lake were those of another

Compress Company, that he had never delivered or authorized Lake to take any receipts rendered by the defendant Compress Company, and if he had those receipts they were obtained without the consent of the plaintiffs in some way unknown to them. The chancellor found in favor of plaintiffs on that point, and we think the evidence supports the finding. That being so, there is nothing shown to estop the owners of these receipts from asserting their ownership to this cotton. It was their cotton for which it holds the receipts of the Compress Company: have neither sold it nor transferred the compress receipts therefor to others, and, so far as the law is concerned, their right to recover is clear. The chancellor, we think, correctly decided in their favor against the Compress Company.

Second, as to the action of the Citizens' Bank against the Compress Company to recover the value of the 129 bales of cotton for which it holds the receipts of the Compress Company. The evidence shows that the cotton for which these receipts were given is not now in the possession of the Compress Company. One bale of this cotton the Compress Company admits that it lost, and the other 128 bales that it ought to have to meet these receipts held by the bank it, as before stated, delivered to Lake on receipts of McMurray & Company, which he had surreptitiously obtained. In other words, the Compress Company let Lake have 128 bales of cotton belonging to the bank which it held as collateral security for loans made to Lake upon his surrendering to the Compress Company receipts given to McMurray & Company. But, as we have seen, these receipts had never been transferred or indorsed by the owners, and showed on their face that they did not belong to Lake. The Compress Company simply took Lake's word for it that he was the owner of the receipts. The Compress Company thereupon surrendered to him cotton for which it had previously delivered its receipts to the Bank, and to which it should have known that the Bank had a claim.

Counsel for the Compress Company attempts to have it evade liability by contending that the receipts of the Compress Company held by the Bank call for only a certain number of bales of cotton, and do not describe or identify any particular cotton, and that therefore the title to the cotton did not pass

to the holder of the receipts. But this cotton was purchased outside of the city and shipped to this market. It was paid for by drafts on the Bank to which the bills of lading of the railway company describing the cotton were attached and held by the bank as security for the loan. This cotton was thus identified at the time of the purchase, and the title thereto vested in the Bank by transferring to it the bills of lading issued by the railway company. Afterwards, when the cotton arrived at the compress, the Compress Company took up the bills of lading and gave the Bank in lieu thereof compress receipts stating the number of bales of cotton, but this exchange did not affect the title of the Bank to the cotton. This was then not an attempted transfer to the Bank of a cerain number of bales out of a larger number, where title would not pass until a separation or selection was made. It was a transfer to the Bank of a certain selected lot of cotton, which, while in the hands of the warehouseman, was afterwards mingled with a larger number of bales so as to make identification more or less difficult. But this mingling did not divest the title of the Bank, and it still owned a certain number of bales in the hands of the Compress Company.

But, if we concede that no particular cotton was identified by these receipts, and that no title passed to the Bank, the Compress Company would still be bound for the number of bales of cotton named in the receipts. The receipts would, in effect, be a contract on the part of the Compress Company that it would hold for and on demand deliver to the owner of the receipt or his assignee the number of bales of cotton named therein. This is not a suit between the Bank and a creditor of Lake attaching the cotton, nor between the Bank and the person to whom Lake sold the cotton after he withdrew it from the Compress Company. In such a suit the question as to whether the title of the cotton passed to the Bank might be very material. But in this action between the Bank and the Compress Company it is not very material whether the title passed to the Bank or not. If the title passed to the Bank, the Compress Company has wrongfully disposed of 129 bales of cotton belonging to the Bank, and must account to it for the value thereof. If the title did not pass to the Bank, still the Bank

holds the contract of the Compress·Company to the effect that it has received of the Alphin-Lake Cotton Company 129 bales of cotton which it agrees to deliver to the Bank on demand, and which contract it has failed to perform, and it must respond in damages for the value of the cotton, or at least to the exent of the Bank's debt or interest in the cotton.

If this was an action at law for conversion, it might be material for the Bank to show that it had title to the cotton; but, it being now an action in equity to settle the rights of these parties growing out of the transactions set up in the pleadings, the question whether title passed to the Bank is not material to show liability of defendant. There is no denial that the cotton mentioned in the receipts was actually delivered to the Compress Company. The Compress Company had notice that the receipts which it issued therefor were held by the Bank as a collateral security for a loan to Lake. Under those circumstances, as between the Bank which held the receipts and the Compress Company which issued them, we think that the Compress Company is liable to the Bank for the number of bales of cotton called for by the receipt, whether the title to the cotton passed to the Bank or not.

Again, the Compress Company undertakes to justify its conduct in turning over to Lake this cotton for which the Bank held its receipts, on the surrender by him of receipts issued by the Compress Company to McMurray & Company which he had found, by saying that it was the custom to treat all these compress receipts as made to bearer. But the receipts were not issued to bearer. The receipts which the Compress Company accepted from Lake in exchange for this cotton were issued to McMurray & Company. On the surrender of receipts issued to McMurray & Company, and which had never been indorsed by them, the Compress Company delivered to Lake cotton which he had pledged to the Bank which held the receipts of the Compress Company therefor. The Compress Company had notice that the receipts which it had·issued to Lake for this cotton had been pledged to the Bank, and yet, without consulting the Bank, it turned over to him this cotton on his surrendering receipts of another party for other cotton which receipts he had found. In acting in this way the Compress Com-

pany acted in direct violation of our statute which forbids a warehouseman from removing or permitting: to be shipped or removed beyond its control any goods, cotton, grain or other produce or commodity for which he has given his receipts without the written assent of the person holding his receipt. Kirby's Digest, § 527. The Bank did not assent to this act of the Compress Company, and the Compress Company can not set up a custom to protect it from the consequences of its act done in direct violation of the plain mandate of the statute. *Dickinson* v. *Gay,* 7 Allen (Mass.), 29, s. c. 83 Am Dec. 656; *Coxe* v. *Heisly,* 19 Pa. St. 243; 29 Am. & Eng. Enc. Law (2d Ed.), 376-378.

But, even if the statute could be abrogated in that way, the evidence does not show any custom that could protect the Compress Company under the facts of this case. The evidence may show that there was a custom for the Compress Company to deliver cotton to the party who had placed it in the company's warehouse upon surrender by him of receipts of the Compress Company for an equal number of bales, whether the receipts were originally issued to him or not, provided that he then owned them, and had a right to surrender them. But there is no proof of a custom that would justify a delivery of cotton which the owner had pledged to a bank with knowledge of the Compress Company upon the surrender by him of a lost or stolen receipt to which he had no right or title, without the consent of the Bank. When cotton was delivered upon the surrender of receipts not issued to the party obtaining the cotton, it was done on the assumption that such party was the owner of the receipts, and had the right to surrender them. If the party obtaining the cotton delivered therefor compress receipts that were issued to and belonged to another, and which he had no authority to surrender, the Compress Company gained no rights thereby in the absence of fault of the legal owner of the receipt, and was in the same position as if it had delivered the cotton without requiring any receipt in exchange therefor. In fact, this custom that the Compress Company relies on seems to have been based on the theory that all men were honest. So long as no unscrupulous dealers appeared, so long as the Compress Company was certain that the parties to whom cot-

ton was delivered were the owners of the receipts they surrendered, no great harm was felt; for, while that was so, the Compress Company always had on hand the number of bales called for by its outstanding receipts, though it might not be the identical cotton for which the receipts were executed. But this loose method of doing business was calculated to attract the attention of dishonest commercial adventurers. That years passed before any harm was felt speaks well for the honesty of those dealing with cotton in this market. But the unscrupulous man arrived at last, and then a day dawned full of danger to these unsuspecting dealers. Taking advantage of this lax method of transacting business, a daring financial buccaneer simply walked off with 128 bales of cotton to which he was not entitled, and for which the Bank that had loaned him money held the receipts of the Compress Company. It is a matter of current history that these were not his only victims. Other banks, compress companies and even railroads suffered from his assaults. The question here is whether this Bank or the Compress Company, neither of which had been guilty of any intentional wrong, must sustain the loss in this case. The substance of the matter is that Lake bought 129 bales of cotton and shipped it to the Compress Company. He transferred the railroad bills of lading to the Bank to obtain money to pay for the cotton. Afterwards the Compress Company, or Lake with the knowledge of that company, procured the bills of lading from the Bank by substituting therefor the compress receipts issued in his name for the cotton. Although there was no written indorsement of the receipts, the transfer was good in equity, and gave the Bank an equitable title thereto. The debt of Lake to the Bank has never been paid. It still holds the compress receipts. But the Compress Company, relying on Lake's word that he was the owner of other receipts belonging to McMurray & Company, turned him over in exchange therefor the cotton that in equity belonged to the Bank. As the Compress Company had notice that these receipts were held by the Bank, as it was not in any way misled by the Bank, and as the Bank has never consented to this act of the Compress Company in delivering the cotton to Lake, we think that the Compress Company should account to the

Bank for the value of the cotton, or for such an amount as will cover the Bank's debt. For, in delivering cotton to Lake for which the Bank held its receipts without the consent of the Bank, the Compress Company violated both its contract and the statute of the State, and must bear the loss resulting from its own carelessness.

On the whole case, the judgment of the chancellor as to McMurray & Company and Miller & Company will be affirmed. The judgment in favor of the Compress Company as to claim of Citizens' Bank will be reversed, and the cause remanded with an order that the cause be referred to a master or commissioner to hear evidence and determine the value of the 129 bales of cotton for which the Bank holds compress receipts, and on the coming in of such report that the Bank have judgment against the Compress Company for the value of the cotton.

By consent of parties the 128 bales of cotton in the hands of the Compress Company at the time these actions were commenced were sold and the proceeds deposited in the bank to await the action of the chancery court. This cotton has been decided to be the property of McMurray & Company and Miller & Company, but under the terms of that agreement we do not think these parties can recover interest on the money except from the date of the judgment of the chancery court. Nor do we think that the bank which held the money should be allowed interest on the sums claimed by it except from the date of that judgment. After the judgment the Bank had no right to retain the fund, and must pay interest, and is entitled to recover from the Compress Company interest on its debt from the same date.