WEAVER COTTON COMPANY v. BATESVILLE COMPRESS COMPANY.

Opinion delivered March 30, 1925.

1. WAREHOUSEMEN—UNINDORSED RECEIPT—BONA FIDE PURCHASER.— Where a warehouse receipt for cotton stored which obligated the warehouseman to deliver the cotton "upon surrender of this receipt properly indorsed" was lost without being indorsed by the bailor, and his name was altered, and the indorsement of another name was forged thereon, a *bona fide* purchaser of the receipt for value acquired no rights, as the warehouseman was liable only according to the terms of the receipt as issued.

2. WAREHOUSEMEN—NEGLIGENCE.—A warehouseman was not negligent in delivering cotton to the owner who had lost his receipts, as against a purchaser of the receipts not indorsed by the owner, although the warehouseman failed to exact of the owner an indemnifying bond, as provided by Crawford & Moses' Dig., § 10358.

Appeal from Independence Circuit Court; *Dene H. Coleman*, Judge; affirmed.

*Cole & Poindexter,* for appellant.
*Samuel M. Casey,* for appellee.

WOOD, J.. On the first day of October, 1923, the appellant instituted an action against the appellee for the conversion of two bales of cotton. The appellant alleged that on the 20th of November, 1922, the appellee received from one J. W. Black two bales of lint cotton, and became the bailee and warehouseman for said cotton and issued to said Black two receipts for same, which receipts were negotiable; that the appellant became the holder of these receipts in due course for a valuable consideration; that, in April, 1923, it made demand of the appellee for the cotton, and appellee failed and refused to deliver the same to the appellant; that the appellee thus wrongfully converted the appellant's cotton, of the value of $285.73. The appellee denied liability to the appellant, and set up in defense that the appellant presented two receipts for the cotton which had been altered since appellee issued them; that the receipts were originally issued by the appellee to one J. W. Blair; that, when presented to the appellee, the name had been changed to J. W. Black, and the indorsement on the back of the receipts was J. W. Black; that, because of this forgery, the appellee did not honor the receipts, and for the additional reason that they had already turned over to J. W. Blair, the owner of the cotton, the two bales of cotton described in the tickets, said Blair having reported to the appellee that he had lost his tickets.

The facts are substantially as follows: The appellant was in the business of buying and selling cotton and the appellee was engaged in the business of warehouseman and bailee for hire, and handling compressing and storing cotton in the bale. The appellant carried on its business in the following manner: If a man had a bale of cotton for sale, he generally had a receipt from the compress and a sample. The appellant bought the cotton by an examination of the sample, and having the receipt transferred to it by an indorsement of the name of the holder of the ticket or receipt on the back

thereof.   The appellant purchased altogether on the compress numbers.   It paid no attention to the names in the receipt.   It bought often from people whom it did not know.   They had the samples, and appellant took the samples and number that corresponded with the number on the ticket, and it did not have to have the names of the parties holding the tickets identified. · Appellant bought two bales of cotton which were represented by tickets, which tickets were introduced in evidence.   The material part of the ticket was as follows: "Received of, J. W. Black of Red Stripe, owner, one bale of cotton numbered and described as follows:   Private mark— number—weight in 500 re-weight, to be stored and held, subject at all times to reasonable inspection by the owner, and delivered upon surrender of this receipt properly indorsed, and the payment of accured charges."   On the back of the receipt was the following:   "For value received, I hereby transfer and assign the herein described cotton, representing the same to be my own property; that it is free from any lien and incumbrance whatever, and that I have a good right to sell, assign and transfer the same.   (Signed) J. W. Black, owner."   There was also indorsed on the back of the receipts in rubber stamp, "Williamson, Inman & Stribling."   The two receipts, except as to the number and weight of the cotton, were precisely the same.   There was a tag number on the inside of each sample which came off of the compress tag and corresponded with the number on the ticket.   The appellee bought the cotton represented by the tickets on the first of March, 1923, and sold the cotton three or four days after that to Williamson, Inman & Stribling.   The cotton was not delivered to the purchaser, and appellant refunded the money and took the tickets back.   Appellant then made demand on appellee for the cotton.   Appellee refused to deliver the cotton or to reimburse appellant, and appellant then brought this suit.

The cotton was worth $285.   Appellant didn't know the name of the man it bought the cotton from.   The

tickets were written with lead pencil. The man that represented Black claimed that his name was O. J. Baker. Appellant asked Baker to whom it should make the check in payment for the cotton, and made the check out to J. W. Black or O. J. Baker. Appellant stood on everything that comes on the cotton ticket, and the number of course. A holder may have altered the tickets, but appellant didn't know anything about it. The tickets show that they were issued on the 20th of November, and appellant purchased them in March. It was not unusual for a man to hold the tickets that long. Appellant had purchased tickets that had been held a year. There was nothing unusual in buying that way. The number on one of the tickets was 50,522 on the other 50,523. The tickets didn't appear to have been altered or changed.

Three witnesses who were cotton buyers in Batesville testified to the effect that they were familiar with the way that the appellees handled cotton stored with it for compress, and that the receipts issued by the appellee were for the cotton stored with it. The receipts in controversy were submitted to these witnesses, and they testified that, in their opinion, they were genuine receipts.

A witness for the appellee testified that he was the weigher for the appellee in November, 1922. The tickets introduced in evidence were exhibited to the witness and he was asked if he had issued any such receipt as that, and answered that he didn't think that he issued these receipts. Witness actually weighed and received the cotton, but did not issue any receipt to J. W. Black. Witness had duplicates of the receipts he issued that day which he kept in a book for that purpose. He issued two tickets on the same number as that on the tickets in controversy, and on the same date, to J. W. Blair at Red Stripe. He examined the tickets and stated that the name "J. W. Black" had been written there, or the name changed since witness issued it. The initials are the same, but it seemed to witness that the name had been changed. Witness issued the tickets to the man

who brought the cotton there for Mr. Blair. Witness didn't remember his name. A man by the name of Blair came in a few days after the cotton was delivered to the appellee, and, after witness had written the receipts, and claimed that he didn't have the receipts, and witness told him that he could make bond for the receipts and get his cotton in that way. Witness was informed that Blair made bond. It was the custom of the appellee that, when a man stored cotton in its warehouse, he would have to bring the receipts in order to get the cotton, and, if he could not produce the receipts, he was required by the warehouse company to indemnify it by giving a bond for any loss to the company sustained by delivery of the cotton to him. Witness located the receipts that he issued by the numbers on the tickets. It was the custom of the appellee to locate the cotton and let it out and deliver it by the number on the receipts. These tickets were written in lead pencil and delivered to whoever brought the cotton. Witness had no way of knowing the party to whom the receipts were issued, so, in order to keep witness in the clear, he went by the numbers. He had a series of numbers running on the book. One of the witnesses stated that the receipts looked as though the last part of the name had been changed.

The court gave the following instruction: "The undisputed proof in this case shows that the tickets bearing the same numbers were issued to J. W. Blair and the tickets themselves show on their face to be the same tickets except the difference in the name (J. W. Black). It is alleged in the defendant's answer, and not denied, that the two bales of cotton covered by the original tickets have been delivered to J. W. Blair, the true owner of them, and, under that state of facts, there would be no liability on the part of the compress company for it, and it is your duty to return a verdict for the defendant." The jury returned a verdict in favor of the appellee, and from the judgment in appellee's favor is this appeal.

Section 10357 of C. & M. Digest is as follows: "The alteration of a receipt shall not excuse the warehouseman who issued it from any liability if such alteration was (a) immaterial; (b) authorized; or (c) made without fraudulent intent. * * * Material and fraudulent alteration of a receipt shall not excuse the warehouseman who issued it from liability to deliver, according to the terms of the receipt as originally issued, the goods for which it was issued, but shall excuse him from any other liability to the person who made the alteration and to any person who took with notice of the alteration. Any purchaser of the receipt for value without notice of the alteration shall acquire the same rights against the warehouseman which such purchaser would have acquired if the receipts had not been altered at the time of the purchase."

Section 10349 provides: "A receipt in which it is stated that the goods received will be delivered to the bearer, or to the order of any person named in such receipt, is a negotiable receipt. No provision shall be inserted in a negotiable receipt that it is non-negotiable. Such provision, if inserted, shall be void."

In *Shaw* v. *Railway Co.*, 101 U. S. 557, the court had under consideration bills of lading which, under statutes, were made negotiable by indorsement and delivery. In distinguishing between such instruments and bills of exchange and promissory notes commercial paper circulating as evidence of money, the Supreme Court of the United States had this to say, at page 564, concerning negotiable bills of lading: "It is not a representative of money, used for tranmission of money, or for the payment of debts or for purchases. It does not pass from hand to hand as banknotes or coin. It is a contract for the performance of a certain duty. True, it is a symbol of ownership of the goods covered by it—a representative of those goods. But, if the goods themselves be lost or stolen, no sale of them by the finder or thief, though to a *bona fide* purchaser for value, will divest the ownership of the person who

lost them, or from whom they were stolen." See *Citizens' Bank* v. *Arkansas Compress and Warehouse Co.,* 80 Ark. 601-608.

The above language by the Supreme Court of the United States is apposite to warehouse receipts which are negotiable under our statute. While the indorsement by the original owner or depositor in whose name such receipts are issued confers upon any subsequent innocent holder for value a right to demand a compliance with the terms of the statute, *i. e.,* the delivery of the property to him by the warehouseman, yet the indorsement of such receipt by one who is not the original depositor or owner and in whose name the receipt was issued, does not confer upon a *bona fide* holder for value any such right. In other words, negotiable warehouse receipts in the form of these in controversy must first be indorsed by the person to whom delivery was promised by the terms of the receipt in order to confer any rights upon a subsequent holder for value. Subdiv. 3, § 10353, Crawford & Moses' Digest.

The forging of an indorsement of the name of the original depositor or owner in whose name a negotiable receipt is issued by one who may have found a lost receipt or who may have stolen the same, can confer no rights upon a *bona fide* holder of such receipts for value, for the reason that the forged indorsement of such receipt is in law no indorsement at all. In *Citizens' Bank* v. *Arkansas Compress & Warehouse Co., supra,* we said: "The compress receipt represents the property, and the transferring of the compress receipt by the owner transfers the title to the property. But a thief who finds a compress receipt can give no more title to a purchaser from him than he could to property which he had found or stolen * * *. The finder of an undorsed receipt, which on its face, shows the name of the true owner, can not, by selling or surrendering such receipt, transfer the title of the owner." The receipts under review, by their express terms, only obligate the

compress company to deliver the cotton upon the surrender of this receipt properly indorsed.

In case-note to *National Union Bank* v. *Shearer,* 17, Ann. Cas. 673, under the head of "Negotiability of Warehouse Receipts," it is said: "But a transfer without indorsement will merely transfer the title of the transferor and will not afford the transferee the greater rights which are granted under the statute." True, the receipts under consideration were indorsed "J. W. Black," the name of the person designated in the receipts, but the undisputed testimony shows that the receipts were issued to J. W. Blair and that the name of Black had been substituted in the body of the receipts for "Blair," and also that the name of "J. W. Black" indorsed on the receipts were forgeries. Since, as we have already seen, a forged indorsement was tantamount to no indorsement at all, it follows that the appellant had no title which would give it the right to compel the appellee to deliver to it the cotton, and to render appellee liable to appellant because of its failure to deliver the cotton.

Sections 10355 and 10357 of C. & M. Digest, upon which appellant relies to sustain its cause of action, clearly mean that, where a warehouseman has issued a "negotiable receipt, the negotiation of which would transfer the right to the possession of the goods," then such warehouseman, unless he takes up and cancels the receipt, shall be liable to any one who purchases the same for value and in good faith, for failure to deliver the goods to the purchaser of the receipt. Where a negotiable warehouse receipt has been issued and properly indorsed and negotiated, that is, transferred to one who has in good faith paid value therefor without notice, then the warehouseman is liable to the one who holds such receipt if such owner offers to surrender the receipt with such indorsement as would be necessary for the negotiation of the receipt, and if the holder of the receipt is ready and willing to sign an acknowledgment when the

goods have been delivered showing such delivery, if such signature is requested by the warehouseman. If such be the fact, the warehouseman would be liable, notwithstanding any material or fraudulent alteration of the receipt after its negotiation. A warehouseman is liable under the statute "according to the terms of the receipt as originally issued." If the receipt when originally issued is a negotiable receipt and negotiated by proper indorsement to one who, in good faith, has paid value therefor, any material or fraudulent alteration of such receipt would not excuse the warehouseman from liability to the innocent holder for value upon the failure to deliver to him the goods for which the receipt was issued. Such we believe to be meaning of §§ 10352, 10355 and 10357 of the warehouse receipt act contained in chapter 101 of C. & M. Digest.

Here, the undisputed testimony shows that, according to the terms of the receipts as originally issued, the appellee, warehouseman, was not to deliver the goods except "upon the surrender of the receipts properly indorsed." The undisputed facts are that there was no proper indorsement and therefore no negotiation of the receipts which would transfer the title to the receipts and the right to the possession of the cotton to the appellant. The reason is, as before stated, that the indorsements of the receipts were forgeries.

Appellant further contends that the appellee was negligent in that it delivered the cotton to Blair without the production of the warehouse receipts, and that it should be held liable to appellant under the doctrine that, as between two innocent parties, the loss must fall upon the one whose act contributed most to produce it. The complaint of appellant shows that it bottomed its cause of action upon the ground that it was the holder of the receipts "in due course for a valuable consideration." We find nothing in the pleadings or proof to justify a finding that the appellant had the legal title to the receipts and therefore the right to demand possession

of the cotton of the appellee.   Even if appellant's contention here were within the issue raised in the court below, there was no testimony to warrant a finding that appellee should be held as a warehouseman for negligence in delivering the cotton to Blair, its true owner, rather than to the appellant, who had no legal title to the receipt and therefore no right to demand possession of the cotton of the appellee.   The appellee, as warehouseman, under § 10358, C. & M. Digest, was not negligent because of the fact that it failed to exact an indemnifying bond specified in such section.   The appellant does not contend, and there is no proof, that the bond executed by Blair to the appellee was insufficient to cover all damage to any person incurred by reason of the delivery of the cotton without the surrender of the receipts.

We find no error in the rulings of the court, and the judgment is therefore affirmed.